# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

URBAN OUTFITTERS, INC., et al.    :    CIVIL ACTION

        v.              :

BCBG MAX AZRIA GROUP, INC., et al.  :    NO. 06-4003

## MEMORANDUM

Baylson, J.                                       **August 24, 2007**

## I.   **Introduction**

The issue presented is whether the sale of women's clothing under the trademark True People infringes upon the competing Free People trademark. On May 10, 2007, following a Memorandum and Order dated April 18, 2007 (Doc. No. 125), the Court entered a preliminary injunction (Doc. No. 153) granting certain relief to the Plaintiffs, Urban Outfitters, Inc., Urban Outfitters Wholesale, Inc., and Free People LLC (collectively, the "Urban Group"). Following additional discovery, this Court held a non-jury trial on a series of dates between May 15, 2007 and June 12, 2007. After post-trial briefing, the following Memorandum constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Civil Procedure 52.

Plaintiffs assert that the evidence presented at the trial, together with the record of the preliminary hearing proceedings, only serves to bolster Plaintiffs' trademark infringement and unfair competition claims. They argue that they are entitled to additional relief, and have suggested a virtual shutdown of the True People mark, limiting its future sales to the type of merchandise and type of retail outlets in which Defendant Street Beat, Inc. was selling merchandise under the True People brand prior to August 2006, when, Plaintiffs assert, Defendants commenced the illegal conduct which is the subject matter of their claims.

1

Defendants, BCBG Max Azria Group, Inc. ("BCBG"), Street Beat Sportswear, Inc. ("Street Beat"), and Max Rave, LLC ("Max Rave"), although asserting that Plaintiffs have failed to prove any trademark infringement, recognize, because of the entry of the preliminary injunction and certain findings the Court made on the record at the end of the trial, it is likely that the Court will grant some injunctive relief.  Defendants have therefore proposed a form of order which grants Plaintiffs very limited relief.

This Memorandum will assume familiarity with the contents of the Court's April 18, 2007 Memorandum and May 10, 2007 Order.  The Court finds the testimony taken at the trial to be consistent with the testimony presented at the preliminary injunction hearing.  The Plaintiffs produced supplemental testimony about Defendants' conduct with respect to the True People brand, which was unknown to them at the time of the preliminary injunction hearing.  In particular, they presented evidence of Defendants' plans to embark on a new retail merchandising strategy for a number of Defendants' existing brands, including the True People brand, to be sold at malls in newly renamed "Parallel" stores throughout the United States.  As of the date of trial, two Parallel stores had already been opened, one in California and one in Nevada, and substantial testimony was received concerning this merchandising initiative.  Plaintiffs also produced substantial evidence that Defendants have been using a True People "hang tag" in their stores as recently as the commencement of this trial, which is remarkably similar in pattern and style to a hang tag previously used by Plaintiffs on its Free People clothing.

Defendants asserted that their adoption of the Parallel store merchandising concept, including sales of True People merchandise in the Parallel stores, would not result in any trademark infringement and was a legitimate and legal merchandising initiative.  They presented

testimony that the hang tag discovered by Plaintiffs was placed on True People clothing without any intention to confuse consumers about the Free People mark.  The Defendants further argued that the Court should not issue any injunctive relief, particularly because the sale of True People merchandise in the Parallel stores would include an identification of the True People brand as part of the BCBG Max Azria "empire," thus negating any association with the Free People brand for any shopper or potential customer.  Defendants also introduced evidence to support their counterclaim for cancellation of the Free People mark as a result of fraudulent procurement.

In summary, considering the testimony taken at the preliminary injunction hearing, which has been considered as part of the record for purposes of final disposition, and the additional testimony taken at trial, together with the findings which the Court made in its April 18, 2007 Memorandum, and on the record at the conclusion of the trial, Tr. 6/12/07, the Court finds that Plaintiffs have satisfied their burden of proof under applicable legal precedents and are entitled to permanent injunctive relief.   The Court's findings with respect to the testimony and evidence introduced at trial and the parties' legal contentions are described more fully below.

## II.   **Parties' Contentions**

### A.   **Plaintiffs**

Plaintiffs contend that the overall evidence, from both the preliminary injunction hearing and the trial, show that the Court should find that the Lapp factors weigh in Plaintiffs' favor and that Plaintiffs are entitled to a strong injunction barring Defendants from any sales of True People clothing other than what they were selling prior to the August 2006 Magic Show. Plaintiffs maintain that Defendants should be barred from any attempt to make "upmarket" moves in style, price or retail outlets.  Plaintiffs specifically ask the Court to bar Defendants from

selling any True People clothing in the Parallel stores being located in high-level shopping malls throughout the United States. Plaintiffs also contend that this is an "exceptional case" within the meaning of the Lanham Act, 15 U.S.C. § 1117(a), that warrants awarding attorneys' fees and costs against Defendants.

**B.** **Defendants**

Defendants assert that the record is insufficient to show that Defendants' conduct, at the present, or as planned in the future, is likely to cause confusion with Plaintiffs' mark. Defendants have undertaken to begin selling True People brand clothing in what they describe as a new retail concept, a store called "Parallel," which they will place in various malls in addition to the stores already opened in malls in California and Nevada. Defendants contend that, since Parallel stores will sell higher priced items under brand names already used by BCBG, along with lower priced True People brand clothing, it will clearly indicate to the public that the True People brand is part of the BCBG "family" and remove any suggestion of confusion with Free People. Defendants assert that the evidence does not warrant finding confusion under any of the Lapp factors and dispute in particular the Court's findings on intent. As to the hang tags on Plaintiffs' Exhibit 344, discussed below, Defendants assert that there is no evidence that Free People's blue hang tag was actually used in commerce. However, a substantial portion of Defendants' brief is understandably devoted to urging the Court, if an injunction is to be issued, to making it exceptionally narrow in view of the overall evidence.[1]

---

[1] The Court is likewise concerned about issuing an overly broad injunction because, as the Court has said on the record several times during this case, it would be inappropriate for the undersigned to act as a fashion arbitrator as to what styles Defendants could or could not market or to interfere with the pricing of goods in the marketplace.

Defendants have also filed a counterclaim seeking cancellation of the Plaintiffs' Free People trademark, and Plaintiffs have answered.

**III.**   **Summary of Relevant Trial Testimony**

    **A.**   **Plaintiffs' Evidence**

        **1.**   **Pink True People Hang Tag**

At the trial, Plaintiffs introduced evidence that Defendants were selling merchandise with a tag that Plaintiffs alleged was clear evidence of infringement. An image of the two tags, marked as Plaintiffs' Exhibit 344, is attached. The tag on the left, which is in a deep blue color, was allegedly used by Free People, whereas the tag on the right, in a medium pink color, was used by Defendant True People.

There was significant testimony at the trial about Defendants' use of the pink tag.[2] The Court made specific findings at the conclusion of the trial, as the side-by-side copy of the tags demonstrates, that the great similarity between the two tags showed that True People had copied the style of the Free People mark, by the type of tag, the background on the tag, and the nature of the cursive font of the "True People" name on the pink tag used by Defendants. Tr. 6/12/07, at 181-85. The Court found that the Defendants' explanations for the development and use of the

---

[2] When the tags were first brought to the Court's attention at a hearing prior to the commencement of trial, Tr. 5/2/07, defense counsel asserted that the pink True People tag shown on Exhibit 344 was over one year old and only being used for "closeout merchandise" in a few stores and did not represent any improper conduct by Defendants. Id. at 36-37. The evidence presented at trial clearly showed that the Defendants, until the time of trial, made extensive use of this pink tag on jeans sold in many of their stores throughout the United States. The Court does not fault defense counsel, but believes that, together with the Defendants' failure to produce the pink tag during discovery, the Defendants themselves were not candid and complete in their disclosures to their own defense counsel about their merchandising with labels and tags used on True People jeans.

pink True People tag were not credible and demonstrated intent to copy the Free People trademark. Id. at 182-84.

Defendants' main defense to this allegation is first, that any similarity was coincidental, and second, that Plaintiffs never proved they actually used the blue Free People tag and therefore failed to establish a requisite element for trademark infringement. The Court rejects this assertion by Defendants. At the preliminary injunction hearing, Kristine Meehan, a Plaintiffs' witness and Director of Sales of Free People, was shown Defendants' Exhibit 10 on cross examination, which is a multi-page document showing numerous labels and tags using the Free People name. Tr. 1/9/07, at 177-78. That exhibit contains a depiction of the same Free People tag as shown in Exhibit 344. When asked "and all of these have been used at some time?," Meehan answered affirmatively. Id. This testimony was sufficient to establish that Plaintiffs used the blue Free People tag, and the Court rejects Defendants' assertion to the contrary.

However, even if Plaintiffs had not proved the actual use of this specific tag, the Court's findings are based on Defendants' intent to infringe on Plaintiffs' trademark, which can be proven by the Defendants' adoption of the same style and format of a tag developed by Plaintiffs, even if not specifically used by Plaintiffs. Plaintiffs seek protection of their trademark, not any specific tag or label with the Free People name.

### 2.    Parallel Brochure

In May 2007, Plaintiffs first introduced into a evidence a brochure marketing the new "Parallel" store concept for the stores owned by Max Rave currently operating under the names G+G and Rave. This brochure, marked as Plaintiffs' Exhibit 325, outlines all aspects of the new Parallel store concept and contains images of the prototype Parallel store in a mall in Cerritos,

California which the brochure states was opened in February 2007, just a few weeks after the preliminary injunction hearing in this case was completed. The brochure announces that "Parallel is the new BCBG Max Azria melange brand for specialty retail, to be created as a stand alone boutique for the contemporary fashion market." It describes the Parallel concept as a "unique blend of BCBG Max Azria brands currently offered in top department stores, BCBGirls, TO THE MAX, MAX AND CLEO, TRUE PEOPLE, and LOLA." Parallel's targeted customer is "the contemporary fashion woman, 20-40 years old, with the taste and aspiration to wear BCBG Max Azria, but not the budget." The stores promise to be "airy" and "loft-like" with the look and feel of a boutique and to include dark wood floors, white walls, faux brick and chandeliers. BCBG's plan, announced in the Parallel brochure, is "to convert its top G+G and Rave Stores to Parallel in Summer 2007." Its "natural co-tenants" will be stores such as GUESS, bebe, Adren B., Marciano, Banana Republic and J. Crew. As the pictures of the Cerritos Parallel store clearly reflect, the brands to be sold in the Parallel name are prominently listed several times on the Parallel storefronts and includes the brand "True People."

### 3. Jill Bogan – Regional Loss Prevention Manager for Urban Outfitters/Anthropologie in the Southwest

Jill Bogan testified by telephone that she visited the Parallel store located in the Los Cerritos Mall in Cerritos, California on May 1 and 4 and the Parallel store located in the Miracle Mile Mall in Las Vegas, Nevada on May 7. According to Bogan, the store depicted in the Parallel brochure, Plaintiffs' Exhibit 325, resembled both Parallel stores. Both Macy's and Nordstrom have stores at the Los Cerritos location, and Urban Outfitters has a store at the Miracle Mile location within relatively close proximity to the Parallel store. BCBG Girls

7

branded-clothing comprised approximately half of the items in the Las Vegas store, and the prices for those items ranged from $48 to $100.  Overall, about a quarter of the items in the store cost over $100.

### 3.    Wade McDevitt – Owner of the McDevitt Company

Wade McDevitt testified that his company advises retailers on expansion strategies, demographic analysis and site selection.  Urban Outfitters has been a client of his for over eighteen years, and he has been involved in location decisions for all of Urban's Free People stores.  According to McDevitt, he seeks to site Free People stores in locations where the customer base is comprised of educated, well traveled, well read, urban and suburban, "fashion forward twenty somethings."

He noted that, in the leases for Free People stores, the parties will often list other co-tenants located in the mall.  He listed as examples Puma, Lacoste, J. Crew and Banana Republic, and noted that many of the co-tenants listed in the Parallel brochure, including the top department stores, are similar to the co-tenants sought out by Free People.  McDevitt then identified fifty-two locations where G+G stores are currently located, approximately ten percent of current G+G stores, as being of interest to Free People as possible sites for new retail stores.  According to his definition, an A mall has sales of $600 a square foot or greater, a B mall from $525 to $600, and a C mall less than $525.

### 4.    Glen Senk  – Chief Executive Officer of Urban Outfitters

Senk testified both as part of the Plaintiffs' case in chief and subsequently under subpoena by the Defendants.  As a witness for Plaintiffs, Senk viewed a video of the  G+G store at the Gallery at Market East in Philadelphia, Pennsylvania and testified generally about how the

8

amount of product displayed in a clothing store corresponds to the quality of the store and the price at which the clothing is sold.  He testified that the  G+G store appeared to be a well-executed mass merchant store.  According to Senk, mass marketers such as G+G operate at the lowest level of the price scale.  In order for a store with lower price points to make money, Senk testified that the store must be full of inventory which turns over quickly.

Senk also testified about the facets of the Parallel brochure which concerned him.  He noted that the use of the word "contemporary" in the Parallel brochure signals the stores will sell clothing typically priced between $80 and $300 or $400 or possibly clothing falling under the "young contemporary" category which is a slightly younger, less expensive version of contemporary women's clothing.  The use of the words "specialty retail" and "boutique" in the Parallel brochure also signify a different strategy from the mass retail marketing currently employed by G+G.  In addition to free-standing Free People stores, Senk testified that Free People has fifteen hundred wholesale speciality store accounts and sells Free People branded clothing wholesale to Nordstrom, Bloomingdale's, Macy's and Belk.  Nordstrom is Free People's number one account.  He was concerned that confusion would result if True People were to be sold in a Parallel store in relatively close proximity to a Nordstrom, as opposed to how True People clothing has been sold in the past at mass marketers like Family Dollar.  In addition, the co-tenants listed in the Parallel brochure were ideal co-tenants for Free People.  Finally, Senk testified that it would be difficult for Max Azria to sell True People and Lola[3] in a store that was roughly 2500 square feet at low price points without selling a higher volume of clothing than that

---

[3] Another inexpensive women's clothing brand acquired by BCBG when it purchased the G+G stores out of bankruptcy.

displayed in the Parallel brochure.  He stated it would be difficult to generate $600 a square foot at an average price point of $15 without a larger volume of sales.

### 5.    **Christine Chen and Gary Rafferty Depositions**

Christine Chen and Garry Rafferty testified consistently at trial with their affidavits submitted in the preliminary injunction hearing.  The Court finds that both witnesses were credible and that the Court's findings in its April 17 Memorandum on the issue of actual confusion have not changed after having had an opportunity to hear these individuals testify.

### B.    **Defendants' Evidence**

### 1.    **Antonia Stewart – Investigator for Stumar Investigations**

Stewart testified that she visited a Free People store located in Suburban Square, Pennsylvania on May 15, 2007 and took a video of the store with a camera concealed in her purse.  She stated that she did not see a bicycle or chandeliers in the store, and that the only wooden floors in the store were in the fitting room.  She noted that the store generally presented a loft like space and had wooden display tables.  The Court finds that Stewart's testimony does not undermine the credibility of McDevitt's and Senk's testimony about the "iconic elements" of the Free People brand that appeared at the Suburban Square store.

### 2.    **Patricia Lanzillo – Sales Representative for Street Beat Sportswear**

Lanzillo testified that she now works for BCBG, but prior to that, worked for Street Beat selling True People clothing including dresses, shirts, sweaters, and jeans to customers of Street Beat for a number of years.  She described the clothing sold under the True People mark as low to moderately priced sexy junior's clothing made from lycra and spandex intended for ethnic girls who are "body conscious."  She stated that the two designers who had designed the line

10

sheets for the August 2006 and February 2007 Magic Shows had each been fired because their designs were not sufficiently sexy.  According to Lanzillo, True People has always been sold to low priced retailers like Family Dollar and Joyce Lesli.  She had no expectation that True People clothing would be sold to higher end department stores like Saks, Nordstrom or Bloomingdale's in the future although BCBG would like to sell at Macy's, Dillard's and Kohl's.  In fact, she stated that individuals at BCBG had an appointment with a Macy's buyer that day to discuss selling True People clothing in a "store within a store" type setting accompanied by signs announcing the sale of True People clothing.  However, the True People line currently being exhibited by Street Beat will not be sold in the Parallel stores.

Lanzillo also testified that the prefix "TP" which was used on some of the purchase orders produced by Street Beat indicates that the clothing item is a junior's blue jean and does not correspond to any particular brand or tag.  She testified that she kept files of all the purchase orders for all the various retailers to which she sold clothing and that those files would be boxed up and put into storage periodically.  She never searched for any files for True People clothing orders and was not aware of anyone else searching her files.  She also received weekly emails from Family Dollar reporting on their sales of various items of clothing, but did not search these emails either.[4]

Lanzillo had never seen any advertising of True People goods.  The True People line sheets were never labeled under names like "Westport Debutante" before the August 2006 Magic Show.

---

[4] This evidence strongly suggests Defendants were not complete in their discovery obligations.

11

3.   **Russell Bowers – Vice President for**
     **Retail Finance at the BCBG Max Azria Group**

As Vice President for Retail Finance, Bowers is in charge of real estate for the Max Rave division of the company. According to Bowers, the Parallel brochure was intended to market the Parallel concept to the landlord community and was sent to landlords throughout the United States. He testified that the concept behind the Parallel stores is to sell five different brands, three of which, BCBG girls, To the Max, and Max and Cleo, are more expensive brands which have been sold by the BCBG group for a number of years, and two of which are lower priced brands, Lola and True People, which came to the BCBG group through recent company acquisitions. He described the Parallel concept as targeting twenty to thirty year old women who are more brand loyal than the junior's market.

According to Bowers, Max Rave intends to convert the majority of the four hundred and fifty stores currently operating under the names G+G and Rave to Parallel stores. The three more expensive brands will be sold at their current average price points of $75 for both BCBG Girls and To the Max and $100 for Max and Cleo. The intended price point for True People and Lola goods is going to be "much less" than that, with an average retail price of $20 to $30 and no items exceeding $50. The prices of Lola branded clothes were raised fifty percent before being placed in the Las Vegas Parallel store. The physical quality and design of the True People clothing will be better than it has been in the past and the targeted customer will move from high school age to college age or young adult. The sizes will no longer be junior's sizes and will instead be women's sizes.

Bowers predicted that Max Rave will do $250 million in gross revenues with the new Parallel concept.  He opined that Free People would not be a competitor for the Parallel stores because Free People is offered at a higher price point generally.  According to Bowers, the store depicted in the brochure was "light on merchandise" and operational stores would contain approximately twice that amount of merchandise.  He said that the blend of brands will depend on the quality of the mall in which the Parallel store is located, with a higher concentration of higher priced brands placed in A malls and vice versa.

Bowers was credible as to Defendants' brands, but the Court rejects his opinion that Free People will not be a competitor with the Parallel stores.

### 4.   Maryann Casale-Tooker – Divisional Merchandise Manager for Max Rave

Casale-Tooker testified credibly that she is in charge of buying "bottoms" for the Max Rave stores.  In response to questions about the price attached to the original jeans purchased by Plaintiffs which bore the pink True People tag, Casale-Tooker testified that she was able to obtain a purchase order corresponding to the Stock Keeping Unit or "SKU" number[5] on one of the original pairs of True People jeans purchased by Plaintiffs at the Gallery at Market East.  If the SKU from a given clothing item is input into the Max Rave computer system, it shows the department, cost, style and the number of items currently in stock as well as the vendor who manufactured the garment.  The purchase order reflected that the True People jeans with the pink tag were purchased from Megalink, a manufacturer in China, with delivery dates ranging from

---

[5]  An SKU number is a number put on merchandise in order to keep track of how it is selling in the stores.

Casale-Tooker's testimony also supports Plaintiffs' contentions that Defendants' discovery obligations were not completed.

August to October 2006 and an expected receipt by Max Rave stores of November 2006. She testified that it is not possible to tell what label or hang tag is attached to a pair of jeans from the SKU, only who the manufacturer is, and that neither the True People label nor the hang tag contain any such identifying or tracking information. She stated that she does not send mock ups of labels to China and that her understanding is that the manufacturers already have the labels on hand, which are attached there. The SKU is placed on the jeans in the Max Rave warehouse

Casale-Tooker testified that, at the time of her testimony, all the stores owned by Max Rave are currently running a sale on all merchandise.

### 5.    Michel Amar  – Co-President of Max Rave LLC

Before he took his current position, from February to April 2006, Amar was the Senior Vice President of Production Sourcing for Max Rave. The company he formerly co-owned with Albert Papouchado, Street Beat, is now owned by BCBG. Amar testified he made a trip to Asia in February 2006 to arrange for the production of items for the G+G stores that had been recently acquired by Max Azria. There was very little inventory in the stores at the time because the company had been in bankruptcy proceedings. In Hong Kong, he met with a manufacturer, Megalink, and ordered a number of garments, including anywhere between a thousand and twenty thousand pairs of jeans bearing the True People mark. According to Amar, he did not have any True People labels with him at the time of his trip and asked Megalink to design a few options for him. After briefly viewing the options, he selected the tag that appears in Plaintiffs' Exhibit 344. Amar testified he had never seen the blue Free People tag depicted in Exhibit 344 prior to this lawsuit. He did not show the pink True People tag to anyone else at Max Rave before selecting it, including Papouchado, who had previously been responsible for the True

14

People line, or Melanie Cox, the president of Max Rave at that time.  In the past, Amar testified that Papouchado would supply labels directly to the manufacturer or tell the manufacturer to buy a specific set of labels.

Amar believed that the price tag attached to the jeans with the pink True People tag had been manufactured in the United States and then sent to China to be attached.  He could not tell conclusively whether the purchase order found by Casale-Tooker corresponded to the jeans introduced by the Plaintiffs.

Amar estimated that, from the time he places an order with a Chinese manufacturer, it takes five or six months for those items to appear in stores.  Therefore, the jeans he ordered in February 2006 would in all likelihood appear in stores any time between August and November of the same year.  According to Amar, jeans have been a slow seller and have been turning over in stores on an estimated four to six month cycle.  Max Rave buyers receive weekly reports informing them of how quickly a style is selling and how many items remain in the stores, and if certain styles are not selling well, they are typically marked down by the buyers by fifty to seventy-five percent within a few months.  Therefore, any jeans bearing the True People label that came into the stores in November and had not been marked down by January were probably selling well.  Amar stated he would be surprised if there were more than a few pairs of jeans left in the stores bearing the pink True People label, and even those remaining items would be on mark down racks.

Amar testified that there are currently some True People jeans on order for the Max Rave stores to be delivered in 2008 pending his approval of the counter samples.  Although he has not placed a specific order for True People jeans to be sold  in the Parallel stores, the company is

15

pulling True People garments from the Max Rave warehouse and placing them in the Parallel stores. He has distributed Parallel brochures to a number of landlords and requested some financial help from those landlords to renovate the existing stores.

According to Amar, no one requested that he look for documents relating to the True People label or other tags. In addition, he never requested copies of the True People labels or tags currently being stored in the warehouse or sold at the Max Rave stores.

As the Court noted in its findings after the conclusion of all the testimony, Tr. 6/12/07, the Court rejected considerable portions of Mr. Amar's testimony, specifically concerning the origin of the True People hang tag, shown in Exhibit 344, as not credible.

### C. Plaintiffs' Rebuttal

#### 1. Drinker Paralegal Testimony

Plaintiffs called approximately ten legal assistants employed by Plaintiffs' counsel who visited thirty-six of Defendants stores' in eight different states and purchased jeans bearing the pink True People hang tag. This testimony was credible and demonstrated, contrary to Defendants' claims when the pink True People tag first came to light in early May, that the Defendants had been selling merchandise under the True People trademark in many locations in large quantities, and were still selling it after the preliminary injunction hearing and the issuance of the Memorandum of April 18, 2007 and the injunction Order of May 10, 2007.

### IV. Legal Discussion

The Court finds, with one exception noted below, that the discussion of the various Lapp factors in the April 18, 2007 Memorandum is still appropriate in that neither the Supreme Court nor the Third Circuit have decided any relevant cases, and the evidence introduced at trial simply

confirms and supplements the evidence introduced in the preliminary injunction hearing. The one exception is the findings discussed above that solidified and supported, with evidence of significantly greater weight, the Court's conclusion in the April 18, 2007 Memorandum that the Defendants had intended to infringe on the Free People trademark as laid out in Lapp Factor 5.

Two other Lapp factors brief require discussion in relation to Defendants' plans to sell True People brand clothing in the new Parallel stores, because the evidence discussed above reflects a significant up-market movement in True People marketing. Defendants' planned actions, as laid out in the Parallel brochure and as testified to by Defendants' witness, Russell Bowers, indicate Defendants plan to sell True People clothing in Parallel stores located in upscale malls where Free People clothing is already being sold. This strengthens the evidence introduced by the Plaintiffs at the preliminary injunction hearing in support of Lapp Factor 7, that True People clothing will be sold in the same marketing and advertising channels as Free People, and offers further support for the Court's prior conclusion that this factor weighs in Plaintiffs' favor. The evidence introduced at trial also offers further support for the Court's finding that the targets of the parties' sales efforts are the same under Lapp Factor 8. The Parallel brochure suggests that the age and income of the Defendants' targeted consumers for the True People brand will increase if Defendants are allowed to carry out their plan to sell True People clothing in the Parallel stores.

**V.     Remedy**

In determining the appropriate remedy, the Court will follow Professor McCarthy's articulate summary of the case law, as follows:

> In trademark cases, the scope of the injunction to be entered

17

> depends upon the manner in which plaintiff is harmed, the possible
> means by which that harm can be avoided, the viability of the
> defenses raised, the burden that would be imposed on defendant
> and the potential effect upon lawful competition between the
> parties.  As the D.C. Circuit noted: "The law required that [C]ourts
> closely tailor injunctions to the harm that they address."

6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:02.  Federal Rule of Civil Procedure 65(d) requires that the injunction be specific in its terms, and "shall describe in reasonable detail . . . the act or acts that sought to be restrained."  As noted previously, Plaintiffs have asked the Court at the very least, to limit Defendants to selling True People clothing in the same manner, with the same marketing and retail outlets, as were employed prior to the August 2006 Magic show.

The following issues need to be considered.  First, whether the terms of the preliminary injunction should be made permanent or be modified.  Second, whether the Court should permit Defendants to sell True People merchandise in Parallel stores.  Third, whether any restrictions should be conditioned on Defendants' sale of True People clothing by identifying it as a "house brand," i.e., related to the other brands sold by Defendants.  Fourth, whether the injunction should have any time limits.

Concerning the continuation of the preliminary injunction, the Court believes that the purpose of the injunction, as noted above, should prohibit Defendants from seizing upon and benefitting from the infringement which has gone on since the August 2006 Magic show, but should not unduly restrain competition, including price competition, or the sale of women's clothing in general.

The Court will, similarly to paragraph 1 of the preliminary injunction, prohibit

18

Defendants permanently from using the True People service mark for the name of any retail store or boutique. The Court finds that Defendants' objective in embarking on the infringement of the Free People mark was to take advantage of the Free People concept, and allowing Defendants to establish free standing True People stores or boutiques, or departments or sections within any retail outlet or store, would allow the Defendants to continue and benefit from the same activities which the Court has found to have been improper infringement.

The Court will also continue for a period of two years from May 10, 2007, provisions similar to paragraph 2 of the preliminary injunction entered on May 10, 2007, which "froze" Defendants' marketing and advertising to that in use prior to the August 2006 Magic show. The reason for this modification is to acknowledge the dynamic nature of the women's clothing business. After the expiration of two years, Defendants should be able to chose other forms of marketing and advertising that will enable them to compete with other brands, but course, without infringing upon the Free People brand. To "freeze" the True People brand permanently to exactly what it was prior to August 2006, and not permit any non-infringing changes, would be unnecessarily restrictive and unfair.

However, coming to Defendants' Parallel store initiative, the evidence warrants a conclusion that including the True People name and merchandise within the Parallel stores or as a mark on the exterior of the Parallel stores is an attempt by the Defendants to compete directly with Free People, by locating Parallel stores near free standing Free People stores, or near major department stores, such as Macy's and Nordstrom. The Court finds that selling the True People brand within a Parallel store, even with identification of True People as a house mark within the BCBG Max Azria "empire," would allow Defendants to continue their infringing activities and

provide an opportunity for the Defendants to profit unfairly at the expense of Plaintiffs. Defendants are free to compete as they wish against Free People, but not by the use of the True People mark infringing on the Free People mark.

The Court will not make any restrictions on the pricing of True People goods, finding that the evidence consistently showed that True People merchandise was sold at prices significantly less than Free People clothing and, therefore, there is little danger of confusion concerning prices. The pricing of women's clothing is a confused and a confusing subject and best left to the marketplace for resolution.

The Court believes that the above summary of the injunction to be issued is a fair one. Defendants will not be able to continue their infringing activities through the sale of True People goods in either the Parallel stores or any other retail store or boutique, or department or section within any retail outlet or store, with True People in the name. Defendants will not be able to use tags, labels and other marketing devices which copy the Free People logo. The Court will not impose any restrictions on fashion styling or price.

The Court is unwilling to constrain the True People brand to any further degree. The fact that Defendants have infringed Plaintiffs' mark should not permanently forbid the Defendants from any type of expansion of the True People brand in terms of fashion design, marketing, advertising, or choice of retail outlets.

The women's fashion business is a dynamic, constantly changing, highly competitive business. The injunction is designed to prevent Defendants from continuing, or profiting from, the infringing activities which the Court has found were proven by the Plaintiffs, but no more. The point of the injunction should be to prevent Defendants from seizing upon and benefitting

from the infringement which has gone on since the August 2006 Magic show.  Plaintiffs dropped

any claims for damages.  The injunction itself should not be punitive and become a substitute for

damages that were not claimed.

## VI.   Defendants' Counterclaim

Defendants have brought a counterclaim against the Plaintiffs seeking cancellation of the

Free People trademark registration pursuant to 15 U.S.C. § 1119.  On April 2, 1999, U.O.D., Inc.,

a subsidiary of Urban Outfitters, filed a trademark application listing the goods offered for sale

under the Free People mark as "clothing; namely, men's, women's and children's pants, shirts,

jackets, and outerwear; namely, coats and jackets."  Defs.' Ex. 64.  On November 9, 1999,

U.O.D., Inc.'s then president, Kenneth J. Kubacki, signed a combined declaration under sections

8 and 15 of the Lanham Act[6] with respect to the Free People mark asserting that the "[t]he owner

of this mark . . . . has used the mark continuously in commerce for five (5) consecutive years

after the date of registration and is still using the mark in commerce on or in connection with all

goods listed in the existing registration as evidenced by the attached specimen showing the mark

as currently used."  This declaration specified that "willful false statements and the like so made

are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 . . . and that all

statements made of his own knowledge are true; and that all statements made on information and

---

[6] In order to keep a registration alive, the Lanham Act requires the trademark owner to file a § 8 affidavit before the six year anniversary of the registration.  After ten years in use, the trademark owner must then file a § 9 affidavit to renew the registration.  A § 15 affidavit may be filed after five years of continuous use to establish the incontestability of the mark.  McCarthy § 31:79.

belief are believed to be true."[7]  On March 3, 2004, Kubacki signed a similar trademark maintenance document, a combined declaration/application under sections 8 and 9 of the Lanham Act with respect to the Free People trademark.

Defendants maintain that Free People has never sold any men's or children's apparel bearing the Free People mark, and Kubacki signed the 1999 and 2004 trademark registration maintenance documents knowing they contained a false statement that Plaintiffs were selling men's and children's clothing under the Free People mark.  Defendants request that the Court find that Plaintiffs perpetrated fraud on the United States Patent and Trademark Office ("USPTO") and cancel the Plaintiffs' Free People trademark.

Plaintiffs respond that Defendants failed to establish at trial by clear and convincing evidence that the Plaintiffs made materially false statements of fact in their filings to the USPTO.  They contend that the undisputed evidence instead shows that the declarations filed by Kubacki were true when made, and Kubacki believed in good faith that the Free People line included men's and children's clothing when he signed those declarations.  Plaintiffs therefore request that the Court enter judgment in Plaintiffs' favor on the counterclaim.

Section 14(3) of the Lanham Act provides that any person who believes he or she will be damaged by the registration of a mark may bring a petition to cancel that mark at any time if the "registration was obtained fraudulently." 15 U.S.C. § 1064.  Cancellation of a mark is proper "where a registrant makes a false statement as to the use of a mark in connection with the goods or services listed in its registration."  See Universal Nutrition Corp. v. Carbolite Foods, Inc., 325

---

[7]  Section 1051 of Title 15 of the United States Code provides that a application for use of a trademark shall include a verified statement that "to the best of the verifier's knowledge and belief, the facts recited in the application are accurate."  15 U.S.C. § 1051.

F. Supp. 2d 526, 531 (D.N.J. 2004). In order to establish that a federal registration was fraudulently procured, the party challenging that registration must show proof of fraud by adducing clear and convincing evidence that the applicant knowingly made an inaccurate statement in the registration application. See Marshak v. Treadwell, 240 F.3d 184, 196 (3d Cir. 2001); Horizon Healthcare Servs. v. Allied Nat'l, Inc., No. 03-4098, 2006 WL 344277, at *8 (D.N.J. Feb. 14, 2006); Guardian Life Insur. Co. v. Am. Guardian Life Assurance Co., 943 F. Supp. 509, 529 (E.D. Pa. 1996), *abrogated on other grounds by* A& H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3d Cir. 2000). [8]

Both parties agree the party challenging a registration must demonstrate that an applicant "knowingly" made a false statement in its supporting affidavit, but they disagree as to whether proof that an applicant should have known a statement was false is sufficient to prove actual knowledge. Defendants quote the Third Circuit case of Marshak v.Treadwell, 240 F.3d 184, 196 n.8 (3d Cir. 2001) as holding that "proof that the applicant should have known was ample to prove actual knowledge." (Defs.' Counterclaim Br. 14.) By doing so, Defendants misstate the holding of Marshak. In Marshak, the Third Circuit held that the district court erred when it

---

[8] Although Defendants challenge the validity of Plaintiffs' original 1993 registration application in their Complaint, their brief focuses on the combined § 8, § 9 and § 15 maintenance affidavits signed by Kubacki. The same standard applies to statements in registration applications and maintenance documents. As the Federal Circuit has held, fraud "in obtaining renewal of a registration amounts to fraud in obtaining a registration within the meaning of section 14[3] of the Lanham Act." See Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 48 (Fed. Cir. 1986); McCarthy § 31:80.
While the court in Torres distinguished a case where a registrant had made a error in its § 8 affidavit in part on the basis that § 9 required the submission of a specimen showing current use of the mark and a list of goods on which the mark is still in use, § 8 has since been amended to contain an identical requirement. Torres, 808 F.2d at 48; Trademark Law Revision Act of 1988, Pub. L. 100-667 § 110, 102 Stat. 3935.

instructed a jury that the defendants could establish fraud by demonstrating that the person who registered the disputed mark knew or "should have known" that someone else held the legal rights to that mark.  Instead, the Court found, "[t]o demonstrate that a federal registration was fraudulently procured . . . a challenging party must adduce evidence that the registrant actually knew or believed that someone else had a right to the mark."  Marshak, 240 F.3d at 196.

However, the facts of this case are distinguishable from Marshak.  In Marshak, the issue was whether the owner of the registered mark knew that a senior user had common law rights to the mark at the time that the owner applied to register the mark.  Id.[9]  In that context, "[i]f an applicant has a good faith belief that it is the senior user, then the oath cannot be fraudulent."  McCarthy § 31:77.  Here, by contrast, Defendants argue that Plaintiffs do not use their mark on all the goods listed in their registration, and Plaintiffs' statements of use to the USPTO are therefore fraudulent.  In a footnote, the Third Circuit in Marshak distinguished two Federal Circuit cases, G.H. Mumm & Cie v. Desnoes & Geddes, Ltd., 917 F.2d 1292, 1296 (Fed. Cir. 1990) and Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 49 (Fed. Cir. 1986), on a similar factual basis.  In both cases, the Federal Circuit had stated that an applicant acts "knowingly" when filing a statement that the applicant "knows or should know" is not true.  As the Court in Marshak observed:

> [W]e do not interpret those cases as taking the position that proof of subjective

---

[9]  Defendants reliance on the Trademark Trial and Appeal Board ("T.T.A.B.") case of Medinol Ltd. v. Neuro Vasx, Inc., 67 U.S.P.Q.2d 1205 (T.T.A.B. 2003), for the proposition that "actual intent to defraud is irrelevant" is misplaced.  Medinol is not controlling in this action.  Furthermore, Medinol was decided on a summary judgment standard, and the respondent in that action admitted that its "intent to use" statement was false, even though the respondent denied that its intent was fraudulent in making that false statement.  Id. at 1208-09.  Here, the evidence supports the Court's conclusion that Plaintiffs believed their registration was true.

> bad faith is unnecessary in order to prove fraud on the PTO.  On the contrary. . . .
> We understand these opinions to mean simply that in the particular context
> presented there - where the representation related to a matter about which the
> applicant almost certainly had subjective knowledge, i.e., *whether the applicant's
> own company was using the mark in commerce* - proof that the applicant should
> have known was ample to prove actual knowledge.

Id. at 196 n.8 (emphasis added).  The Plaintiffs in this action are similarly presumed to have

knowledge of how their Free People mark was used in commerce.  Thus, as the Federal Circuit

observed in Torres, an applicant for a renewal registration can make a "knowingly false"

representation:

> If the registrant files a verified renewal application stating that his registered mark
> is currently in use . . . and that the label attached to the application shows the mark
> as currently used when in, in fact, he knows or should know that is not using the
> mark as registered and that the label attached to the registration is not currently in
> use, he has knowingly attempted to mislead the PTO.

Torres, 808 F.2d 49.  However, Plaintiffs expressly deny that the statements in their registration

application or trademark maintenance declarations were false and instead presented evidence at

trial that those statements were true when made.

Plaintiffs do not dispute that they market and sell primarily women's clothing under their

Free People trademark.  The Urban Group's Form 10-K statements from the fiscal years of 1997

to 2005 generally describe Free People as a wholesale division that designs and markets young

women's contemporary casual wear.  Pls.' Exs. 250; 251; 252; 253 at 5; 254 at 5; 255 at 6; 256 at

5; 257 at 5; 258 at 5.  When Urban began operating Free People retail stores in 2002, its Form

10-K statements from those years describe those retail stores as offering primarily Free People

branded merchandise targeted to young contemporary women.  Pls.' Exs. 250; 251; 252.

However, Kubacki testified that, at the time he signed the 1999 and 2004 declarations, he

had no reason to believe that the statement in Free People's registration that is was used on men's and women's clothing was untrue. Kubacki Dep. 51. Before he signed the 1999 and 2004 declarations, he reviewed Free People clothing samples and catalogs, and attended Free People board meetings where Free People was discussed. Id. at 54-56, 61, 63, 128. Furthermore, he was aware that children, including his own children, purchased Free People clothing when they were teens and pre-teens. Id. at 52. He also noted that Free People sold pants and tops to both men and women and in sizes that would fit children, and he had seen Free People clothing items that could be worn by men. Id. at 125-26.

Glen Senk, Urban's CEO, testified at trial that Free People goods were sold to children, particularly teen and pre-teen customers, in both 1999 and 2004. He stated that Free People clothing could be worn by both men and women, Tr. 6/5/07, at 48-49, and he pointed out that Free People had a men's clothing designer on staff from 1996 to 2000. Id. at 31. Finally, Senk identified a catalog in which men's Free People clothing was sold. Id. at 61-62; Pls.' Ex. 171.

The Court finds Defendants have failed to establish that Plaintiffs knowingly made a false statement as to the use of their Free People mark in connection with the goods listed in its registration. In order to prevail on their counterclaim, Defendants were required to demonstrate that Plaintiffs knew or should have known that the statement in Free People's registration that the mark was used on men's and children's clothing was false. While Free People is primarily a mark affixed to women's clothing, the evidence produced at trial shows that the trademark "Free People" has been affixed to men's clothing.[10] Furthermore, Kubacki testified in his deposition

---

[10] Defendants' statement in their reply brief that "Plaintiffs have never sold a shred of men's and/or children's clothing" is misleading. Defs' Reply on Counterclaim 5. Plaintiffs' Exhibit 171 contains two pages of male models posing in Free People clothing, and this exhibit





PLAINTIFF'S
EXHIBIT
344

PENGAD-Bayonne, N. J.

that he believed, at the time that he signed the 1999 and 2004 maintenance documents, the Urban Group sold men's and children's clothing under the Free People mark. His belief was based on his attendance at board meetings, his own review of Free People clothing samples and catalogs, and the fact that his own children had worn Free People clothing. Kubacki's 1999 and 2004 trademark declarations were not made fraudulently. The Court will enter judgment in favor of Plaintiffs on Defendants' counterclaim.

An appropriate order is attached.

_____

was discussed extensively at trial.

27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

URBAN OUTFITTERS, INC., et al.          :          CIVIL ACTION

          v.                            :

BCBG MAX AZRIA GROUP, INC., et al.   :          NO. 06-4003

## ORDER FOR PERMANENT INJUNCTION

AND NOW, this 24th day of August, 2007, Defendants BCBG Max Azria Group, Inc., Street Beat Sportswear, Inc., and Max Rave, LLC, are hereby enjoined from:

1.   branding, rebranding, naming or otherwise identifying any retail outlet, store, booth, kiosk, or boutique (or department or section within any retail outlet or store) by using the name or mark TRUE PEOPLE.  In particular, Defendants shall not:

   a.   make any use of the proposed TRUE PEOPLE service mark in connection with any retail outlet, store, booth, kiosk, or boutique (or department or section within any retail outlet or store);

   b.   post, erect, or maintain any sign, banner, storefront window or display, or other advertising materials (whether interior or exterior) identifying, designating, or locating any store, retail outlet, booth, kiosk, or boutique as a TRUE PEOPLE store, retail outlet, booth, kiosk, or boutique;

   c.   post, erect, or maintain any sign, banner, storefront window or display, or other advertising materials (whether interior or exterior) identifying, designating, or locating TRUE PEOPLE as a brand

28

marketed or sold through any of Defendants' stores, retail outlets, booths, kiosks, or boutiques, including the Parallel stores or prototypes;

2. Until May 10, 2009, adopting any advertising or marketing practices in connection with the TRUE PEOPLE mark, which practices they did not already use in connection with that mark prior to the commencement of the MAGIC tradeshow, which was held in Las Vegas, Nevada, from August 28 to August 31, 2006 (the "August 2006 MAGIC Tradeshow").

3. Advertising, marketing, or promoting the sale of TRUE PEOPLE goods and/or services by the use of any labels, hang tags, or similar items such as shown on Plaintiffs' Exhibit 344 or similar thereto;

4. assisting, permitting or licensing any other person or entity to do any of the acts that the Defendants are prohibited from doing pursuant to this order.


BY THE COURT:


_____
Michael M. Baylson, U.S.D.J.

O:\CIVIL\06-4003 Urban Outfitters v. BCBG Max\Urban Outfitters - Memorandum & Order 8-24-07.wpd

29