IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

URBAN OUTFITTERS, INC., et al.      :       CIVIL ACTION

                  v.             :

BCBG MAX AZRIA GROUP, INC., et al.  :     NO. 06-4003

MEMORANDUM

**Baylson, J.**                              **January 31, 2008**

In this trademark infringement case, the Court has previously entered a Preliminary Injunction and a Permanent Injunction.  The following three issues are remaining:

1.     The amount of attorneys fees to be awarded to Plaintiffs in connection with their Emergency Motion for Relief (Doc. No. 156).

2.     Plaintiffs' Motion that the Court award attorney fees to Plaintiffs in this case under the"exceptional case doctrine" (Doc. No. 214).

3.     Defendants' Motion for Relief under Rule 60(b)(2) and (6), F. R. Civ. P. and to reopen the trial record (Doc. No. 228).

## I.    Relevant Background Facts

The following discussion assumes familiarity with the Memorandum Opinions of April 19, 2007 and August 24, 2007 and the Order of May 10, 2007.  Briefly stated, Plaintiffs, owners of the Free People trademark, used for an upscale brand of women's clothing, contend that Defendants have infringed on their brand by the use of True People brand, which was traditionally used for lower price denim clothing, until Defendants, in August 2006, decided to

upgrade the True People brand by instituting a marketing/promotional strategy which, the Court found, infringed Plaintiffs' trademark.  In the prior opinions, the Court substantially, but not completely, agreed with Plaintiffs' contentions.

## II.   <u>Statement of the Case</u>

The Complaint in this case was originally filed on September 8, 2006, and Plaintiffs promptly filed a Motion for Preliminary Injunction (Doc. No. 6).  The Court allowed discovery and held evidentiary hearings on January 9-19, 2007.  An Order dated February 8, 2007 (Doc. No. 86) denied the Motion for Preliminary Injunction based on representations by Defendants.

On February 16, 2007, Plaintiffs filed a Motion for Emergency Relief and Preliminary Injunction (Doc. No. 90), which alleged that Defendants had violated their representations, which had led the Court to deny the first Motion for Preliminary Injunction.  The Court held an evidentiary hearing on February 23, 2007.  As a result, the Court's Memorandum filed April 19, 2007 found that Plaintiffs were entitled to a Preliminary Injunction and suggested that the parties submit proposed forms of Order.  On May 10, 2007, the Court entered a Preliminary Injunction (Doc. No. 153).

Defendants promptly filed Motions for Reconsideration and also for Summary Judgment, which were denied.[1]

After additional discovery, the Court held a non-jury trial on several different dates, on the merits of the case.  The Court made findings of fact and conclusions of law, and granted a Permanent Injunction, filed August 24, 2007 (Doc. No. 212).

---

[1]Defendants attached in support the Declaration of Michel Amar, a principal of two of the Defendants in this case, the contents of which will become relevant in the discussion below.

Following the entry of that injunction, Defendants filed a Motion under Rule 60(b) for

Relief from the August 24, 2007 Order (Doc. No. 228).  Plaintiffs had filed a Motion for

Attorneys Fees under the "exceptional case" doctrine on September 9, 2007 (Doc. No. 214).

On October 9, 2007 and October 18, 2007, the Court held further hearings on Plaintiffs'

Motion for Attorneys Fees under the "exceptional case" doctrine, following which additional

briefing was received on both the exceptional case issue and the Rule 60(b) Motion.

There is a connection between testimony taken on October 9, 2007 and October 18, 2007

on the "exceptional case" doctrine urged by Plaintiffs, and the Rule 60(b) Motion which seeks to

reopen the trial record to include the October testimony, which would to allow the Court to

reconsider certain findings made in the August 24, 2007 Memorandum.  This connection is best

explained by a reference to Plaintiffs' Exhibit #344.  This exhibit shows two "hang tags," a blue

hang tag with the "Free People" name and a pink hang tag with the "True People" name.  A hang

tag is attached to a garment and identifies the brand name of the garment.  Plaintiffs contended at

the trial that their blue hang tag was preexisting and that the Defendants' adoption of the pink

hang tag was so similar to the Plaintiffs' blue tag that it was strong evidence of Defendants'

intent to infringe on Plaintiffs' trademark.  There is undisputedly great similarity between the

design of the two tags, even though the colors are different.

On June 12, 2007, the last day of trial testimony, Mr. Amar testified (in greater detail than

in his Declaration submitted previously), following which the Court noted a disbelief as to

certain parts of his testimony, particularly concerning the origin of the pink hang tag.  See pp. 14-

16 of the Memorandum filed August 24, 2007.  Defendants offered no evidence to support Mr.

Amar's testimony about the hang tag's origin.  The Court had stated this was a very relevant

issue.  This finding was a relevant factor in the Court's decision to enter the Permanent Injunction.  However, at the hearing on October 9, 2007, as detailed below, Defendants introduced the testimony of Mr. Choukroun, who credibly verified Mr. Amar's account of the factual background of the pink tag.  Thus, the Court concludes that it erroneously found Mr. Amar had testified falsely about the origin of the pink tag.

## III.   Award of Attorneys Fees Relating to Plaintiffs' Emergency Motion for Relief

As noted above, the Court granted Plaintiffs Emergency Motion for Relief (Doc. # 90) which alleged that Defendants had violated the preliminary injunction by the use of a document which the Court concluded was a "brochure" at the Magic Show in contravention of a Declaration submitted by Defendants that they would not use such a brochure at the Magic Show.  After a hearing on February 23, 2007, the Court entered the May 10, 2007 Order, including a Preliminary Injunction, concluding also, that because of a violation of their representations that they would use a "brochure," Defendants should pay Plaintiffs' attorney's fees for the value of time spent in connection withe the emergency hearing.  However, the Court has never set the amount of attorney's fees.

Because the violation was short lived, brought to the attention of the Court promptly, and remedied promptly, there is no reason to consider an award of attorney's fees for anything other than the reasonable number of hours spent by the attorneys involved, multiplied by the reasonable hourly rate, plus out-of-pocket expenses.  The amounts requested in Plaintiffs' Motion (Doc. No. 156) are reasonable because the time spent was necessary given Defendants' conduct, and the rates requested are reasonable rates for this district.  Defendants' objections only suggest, with the benefit of hindsight, that the time spent was excessive.  However, all parties

-4-

have employed many lawyers on this case on every issue, and do not seem to have spared any expense in their advocacy. The Court finds that the reasonable attorneys' fees and expenses to be awarded to the Plaintiff for the violation of the May 10, 2007 Injunction amounts to $26,562.00, the amount requested by Plaintiffs.

## IV.     Summary of Testimony Taken on October 9, 2007

The Court will now provide a summary of the testimony taken on October 9, and October 18, 2007. Although initially scheduled to allow the parties to present testimony on the "exceptional case" doctrine, this testimony is also highly relevant as to Defendants' Rule 60(b) Motion, because in that Motion, Defendants seek to reopen the trial record to include the testimony taken on October 9, 2007.

Defendants called a number of witnesses at the hearing.

### A.     Serge Choukroun

Mr. Serge Choukroun, a French national whose speaks excellent English, resides in Hong Kong, the headquarters for his business, Megalink, which designs and manufactures ladies' garments, carried out at a number of plants throughout Asia.  The principal point of Mr. Choukroun's testimony is that his company, alone and without any input from Defendants or anyone else, designed the pink hang tag on Ex. 344, as used by Defendants.  This testimony corroborated the prior testimony by one of Defendants' main witnesses, Michel Amar, who had testified that the hang tag, Exhibit 344, had been designed and made in China.

Mr. Choukroun detailed how his company operates, and that he was visited by Mr. Max Azria, along with Mr. Amar, in early 2006.  They wanted denim merchandise and selected some styles.  They were shown some hang tags, labels and names.  Mr. Choukroun testified that his

company, Megalink, purchases the rights to use various designs from a web designer called

WGSN, and they had previously picked one of these designs to use for another clothing designer,

Lulu Castagnette, a French company, which label was designated as Defs. Exhibit C.  This label

was used briefly beginning in the summer of 2002, but not used thereafter (N.T. 16-43).[2]

      Mr. Choukroun recalled that Max Azria and Mr. Amar wanted to work on the "True

People" design.  He testified to their conduct; their statements were also introduced, but not for

the truth of the matter asserted, but as a basis for Mr. Choukroun to testify as to his own actions.

See N.T. 37-38.  Amar and Azria chose a design that they liked for the line; it was a Lulu

Castagnette design (N.T. 37-39).  Mr. Choukroun said the tag with the floral design on Ex. 344

was made by his designers, and the floral design itself came from WGSN.com (N.T. 43).  Mr.

Choukroun had identified exhibit B as pages from WGSN.com (N.T. 25-26).  Only the dark part

of the floral design from the website WGSN was used in the actual design of the tag for Lulu

Castagnette (N.T. 43-45).  Mr. Choukroun denied that Amar or any other Defendants'

representative provided a design for this tag, and that the clothing to which the tag was going to

be attached was chosen on the day of their meeting.  The label/tag however was chosen at a

different meeting with Megalink (N.T. 48-51).

      Importantly, Mr. Choukroun testified that this tag (Exhibit C) on the garment was one of

the designs that Mr. Choukroun had in his showrooms that Mr. Azria and Mr. Amar liked.  Mr.

Amar told Mr. Choukroun to repeat the look that he liked from the Lulu Castagnette clothing,

including the tag (N.T. 51).  Mr. Amar and Mr. Azria picked five or six different styles from the

_____

[2]The testimony discussed refers to the hearing on October 9, 2007, except for Mr.
Busceti.

Lulu Castagnette selection that they wanted (N.T. 54).  All the styles they selected from Lulu Castagnette had the label with the floral design (id).  Mr. Choukroun said that later he held a meeting with his designers about the order placed by Mr. Amar and Mr. Azria.  The hang tags were discussed and the graphic designer slightly modified the Lulu Castagnette hang tag design for the "True People" line, as is customary (N.T. 55).  The graphic designers of Megalink designed the True People tag and changed the font in the new "True People" tag (Exhibit D) from the font in the Lulu Castagnette tag (Exhibit C) (N.T. 56).  Mr. Choukroun said that the font was changed from what it was on the Lulu Castagnette because the hang tag could not be one hundred percent the same (N.T. 57).  The font that the graphic designers used for the True People line (free booters script) (Exhibit F) came from Dafont.com (N.T. 57).  Mr. Choukroun said the styles and clothing ordered were shown to Mr. Amar on a second visit with the new True People tags (N.T. 61).  Mr. Choukroun told Mr. Amar that the designers had made a few different tags (Exhibit E) for the line, so that Mr. Amar could have a choice, but Mr. Amar barely looked at the choices and said he was fine with the one that they had chosen (N.T. 67).  According to Mr. Choukroun, Mr. Amar was in a rush and needed the goods quickly (id).

At this meeting, Mr. Amar made four orders for four different styles out of the fifty-two styles that were originally agreed upon (N.T. 68).  The orders all involved the new "True People" tag (Exhibit D) (id).  Mr. Choukroun said that he put in the order (Exhibit H) for labels to the C&T Label Company in China and did not converse with BCBG or Max Rave about the order, or show them exhibit H or I (N.T. 72).  Mr. Choukroun stated that he did not know about True People before the order was put in, and he did not know about "Free People" until the hearing (N.T. 74).  Mr. Choukroun was unaware during the time of all these business transactions and

meetings of the possibility of infringement on another brand.  He said that he shipped the goods at the end of October, the first shipment was sent on October 15, and the second later in the month (N.T. 76).  According to Mr. Choukroun, the shipment takes thirty-five days to reach its destination, from China to New York and New Jersey warehouses (N.T. 78).

When observing Plaintiff's Exhibit 344, Mr. Choukroun stated that the font and the floral design used on the True People hang tags are different from the Free People hang tags.  However, the Court still finds, from a layman's point of view, that they are very similar (N.T. 82).

Mr. Choukroun could not remember what Mr. Azria's reaction was when Mr. Amar decided he liked the pink tag when they were in the showroom (N.T. 98).  Mr. Choukroun said a lady named Rebecca Chen was the designer that Mr. Amar talked to about the tags, Exhibit "C", "D", "E", "H", and "I," and that these tags were in her file (N.T. 99-103).  When Mr. Amar was with Choukroun he saw the finished product, the jeans with the tags, and he did not ask for anything to be changed, he said it was perfect, and exactly what he wanted (N.T. 110).  Mr. Choukroun testified that after the orders for the denim from Megalink were placed, no other denim orders were made from (N.T. 112).

At the end of Mr. Choukroun's testimony, he said that he was one-hundred percent certain that no one communicated with Max Rave about the "True People" tag (N.T. 155).

As the Court indicated at the October 18, 2007 hearing (N.T. 17), Mr. Choukroun was a credible witness and his testimony was fully supported by the exhibits.  Although the floral design and fonts on the pink True People and blue Free People tags on Ex. 344 are indeed

similar, the Court accepts Mr. Choukroun's testimony as to how this similarity was achieved.[3]

Because Mr. Choukroun's testimony and the exhibits produced in the hearing on October 9, 2007

on the "exceptional case" doctrine gave valuable and credible support to Mr. Amar's version of

the origin of the pink True People hang tag, the Court concludes that the disbelief of Mr. Amar

was not justified, and that this is a relevant fact on the exceptional case issue.

     **B.**    **Albert Papouchado**

     The next witness called by the Defendants was Albert Papouchado, who had testified

previously in the preliminary injunction hearing, but not at the trial.  He testified to his

supervision of document collection, which had been requested by Plaintiffs in different locations.

Various employees were asked to locate certain relevant documents.  Mr. Papouchado testified as

to the following categories of documents which Plaintiffs claim were not produced:

     1.    As to the pink hang tag, as shown on Exhibit 344, Mr. Papouchado said that he

had not seen it until early 2007, and that he was upset that Mr. Amar had ordered this clothing,

with the hang tag, which was to be sold in retail without his knowledge or approval.

     Mr. Papouchado had a full search conducted for papers and documents having anything to

do with "True People" (N.T. 163).  He claimed that he had not seen the pink tag (Exhibit 344)

until early in 2007, and he saw it because of the hearing (N.T. 180).  No such tag turned up in any

of the searches that he had conducted, and he claims that if he did find a tag, there would have

been no reason to hide it (N.T. 181).  The "True People" logo was supposed to be his, and it

came as a surprise to him to hear that someone else had put an order in for "True People"

---

     [3]Defendants vigorously argued that the Court should reopen the record and allow
discovery as to the origin of the blue Free People tag, but the Court refused this request.

clothing (N.T. 184).  The first time that he saw the label was when it was shown to him in court (N.T. 185).

2.       As to the Parallel program booklet, Mr. Papouchado testified that he was not involved, had not seen it before the litigation, and had not known of any of the Defendants having plans for these Parallel stores (N.T. 192).

3.       Summer 2007 Magic Show line sheets.  Mr. Papouchado testified that these had been prepared for Macy's, but had never been given to the public and were not used.  Therefore, he did not consider their production necessary as they were for purely internal use (N.T. 197).

4.       Explaining Ms. Lanzillo's testimony that she did not search for documents, Mr. Papouchado disagreed, and said that he had specifically asked her to search for documents and personally went to a Brooklyn office and found some documents there (N.T. 199-200).

He summarized his direct testimony by saying that there was no intent not to produce documents or to mislead anyone (N.T. 203-204).

On further cross examination, Mr. Papouchado said that when asked to investigate the pink tag, he discovered that it originated in China without his knowledge, and it was not going to be an ongoing label (N.T. 257).  It was only used for one set of orders.  Most of the garments that came out of China had Lola labels or Max Rave labels (N.T. 257).  According to Mr. Papouchado, he did not know that the pink tags were used, and they were only used on a very small scale, which is why it was so difficult to find documents and investigate the use of the True People tag and its origins (N.T. 257).  He said that he went into a few Max Rave stores in Long Island after the True People tag came out, and claimed that he did not see the pink tag (N.T. 259).

On re-direct, Mr. Papouchado stated he did not remember when he first saw the Parallel

brochure (Exhibit 43), but he recalls not taking it seriously because he gets so many new things (N.T. 262).  During this period, Max Rave was facing bankruptcy and therefore was often changing plans (N.T. 265).

### C.   Robert F. Rugolo

Mr. Rugolo is employed by "Street Beat" sportswear, and he works for Albert Papouchado (N.T. 220).  He had been a marker and grader for "Street Beat" for ten years and worked with the production of garments (N.T. 221).  He stated that Mr. Papouchado asked him to go through about sixty boxes of documents to look for anything to do with the "True People" label.  When he found the documents, he sent them to Mr. Papouchado (N.T. 222).

Mr. Rugolo stated that Mr. Papouchado did not give detailed instructions on what to look for.  Mr. Rugolo went through the boxes one by one in no particular order.  He did not search any of the computers at the company for "True People," and did not search any of the employees' desks (N.T. 225).  Mr. Rugolo sent the documents that he could find to Mr. Papouchado (N.T. 227).

### D.   Zorada Milian

Ms. Milian had been the director of customer service for Street Beat Sportswear Incorporated for five years (N.T. 228).  She was asked by Mr. Papouchado to look for True People documents, and she searched in her file cabinet that had customer orders (N.T. 230).  She did not find any documents on the True People orders in her file cabinet (id).  She printed out the detailed sales from her computer for Pat Lanzillo with the TP (True People) logo (N.T. 231).  She gave what she printed to Mr. Papouchado and that was the extent of her involvement with this matter.

All of the purchase orders that Ms. Milian receive go to her filing cabinet, but after about a year, it fills up and she empties it into a box.  The boxes are stored at 465 Kent in Brooklyn (N.T. 233).  She claimed that she never threw out any papers that she did not need, and that they all went to the filing cabinet (N.T. 234).  None of her computer files would be deleted, all purchase orders with information would stay on the computer (N.T. 235).  She claimed that her Brooklyn files were searched, but not by her (N.T. 242).  Regarding a search for the tags and the True People labels, she was not involved.  She did not go to the Max Rave warehouse in New Jersey, run by Mr. Papouchado, to look for documents (N.T. 245).  She also claimed that she had almost no knowledge of the fire that was in the warehouse (N.T. 246).

**E.**   **Serafino Busceti**

Mr. Busceti was the Information/Technology director for Max Rave or predecessor companies for ten years (N.T. 19-20) (10/18/07).  When the lawsuit was brought, Mr. Papouchado and a Mr. Ray Brown asked Mr. Busceti to do a search for any documents with the term True People in them (N.T. 21).  Mr. Busceti had someone named Joseph Magna, the computer operator, help with this search on the computers and storage boxes (N.T. 21).  They checked the personal computers of Albert Papouchado, Michel Amar, Roy Olsen and Michelle Parenti and found nothing (N.T. 23).  They did a second search and found documents, about an inch thick (N.T.  24).  They also checked several other locations and computers for documents or e-mails concerning "True People" (N.T. 26).

Max Rave uses windows and IBM software on its computers (N.T. 28).  Mr. Busceti claimed that the individual users of the computers that he searched would not have been able to set an auto delete function for their e-mails (N.T. 30).  He stated that none of the back up tapes in

-12-

the warehouse were searched for "True People" (N.T. 30).  The documents that were found were sent to the law firm around October 23 (N.T. 32).  Mr. Busceti answered no to a large amount of questions concerning the detail and the care that went into the search, verifying that it was not a completely exhaustive search (N.T. 29-32).  Mr. Busceti stated that he was never asked to search for the words "Free People" in this whole process (N.T. 34).  He acknowledged that the majority of the e-mails sent by Mr. Amar and Mr. Papouchado are sent from their blackberries, meaning that those e-mails would not have been searched, (N.T. 36), and that no one ever checked the content of the blackberries (N.T. 37).

Defendants also called one of their law firm associates who had retrieved some materials from a website; however, this testimony is not relevant.

## V.   Legal Standard - The Award Of Attorneys Fees For "Exceptional Cases"

Following the Court's Findings of Fact and Conclusions of Law in the August 24, 2007 Memorandum following a non-jury trial, resulting in issuance of a final injunction against Defendants, Plaintiffs filed a Motion for Attorney's fees, (Doc. #214), alleging that  the evidence showed this was a "exceptional case" thus allowing attorney's fees pursuant to § 1117(a) of the Lanham Act.  The Court had declined to rule on this Motion while the merits trial was pending, but started a hearing on this issue on October 9, 2007,[4] during which substantial testimony was

---

[4]Plaintiffs objected to the Court holding an evidentiary hearing on the exceptional case issue and asserted that the Court should decide the issue based on the trial record alone.  The Court decided that an evidentiary hearing was necessary because in the interests of justice, as Mr. Choukroun's testimony showed, the Court's conclusions about Mr. Amar's credibility were incorrect, and secondly, there were substantial contentions by Plaintiffs about "litigation misconduct," which were not relevant on the merits of the trial.  The Court thought it was fair to give the Defendants a chance to produce testimony and give a fuller explanation for some of the problems that developed during discovery.

offered by Defendants intended to refute the Plaintiffs' allegations that this an "exceptional case."  This testimony is reviewed above.

The Lanham Act, as amended in 1975, permits the award of attorneys' fees to the "prevailing party," but only in "exceptional cases."  15 U.S.C. § 1117(a) (1988).  The statute does not define "exceptional" but the pertinent part of the Senate Judiciary Committee Report on the matter states that fees should be awarded when infringing acts can be characterized as "malicious," "fraudulent," "deliberate," or "willful."  S.Rep. No. 1400 93d Cong., 2d Sess. 2 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News, pp. 7132, 7133. The Third Circuit has essentially adopted that standard.  See Standard Terry Mills, Inc. v. Shen Mfg. Co., 803 F.2d 778, 782 n. 7 (3d Cir. 1986).  In order to grant attorneys' fees, a district court must make a finding of culpable conduct on the part of the losing party.  Green v. Fornario, 486 F.3d 100, 103 (3d Cir. 2007).  Such culpable conduct may include, but is not limited to, a showing of  bad faith, fraud, malice, or knowing infringement. Id.

Culpable conduct need not relate to the circumstances of the Lanham Act violation: a court may find that the losing party has engaged in culpable conduct based upon its behavior during the course of the litigation.  Secruracomm Consulting, Inc.  v. Securacom Inc., 224 F.3d 273, 282 (3d Cir. 2000) (upholding trial court's finding that exceptional circumstances existed and justified the award of attorneys' fees, based solely on defendant's culpable litigation tactics).  A district court may not award attorneys' fees without a finding of culpable conduct, but it may decline to award attorneys' fees despite a finding of culpable conduct based on a totality of the circumstances: it is the job of the district court to weigh equitable considerations when determining whether attorneys' fees are appropriate.  Green, 486 F.3d at 103-04.

A strong showing is required to warrant a finding of intention, properly characterized as malicious, fraudulent, deliberate, or willful.  Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 48 (3d Cir. 1991).  It is not enough for the plaintiff to show that the defendant was negligent in marking or selling the goods in question; instead, in order to compel a finding for attorneys' fees, the plaintiff must show that the defendant acted in bad faith, for example, deliberately trying to pass off as his own something that belonged to the plaintiff.  Id., at 48, citing  Jones Apparel Group Inc. v. Steinman, 466 F. Supp 560, 564 (E.D.Pa. 1979) (Pollak, J).

A factor deemed relevant by some courts in declining to award attorneys' fees has been the plaintiff's failure to show any damages as a result of the infringement. Ferrero, 952 F.2d at 47.  Such a finding will generally make a case unexceptional for purposes of awarding fees under § 1117 of the Lanham Act.  Id. at 48.

In an appeal from an award of attorneys' fees under the Lanham Act, a district court's decision will be reviewed for abuse of discretion.  Ferrero,  952 F.2d at 48.  Thus, a trial court's decision will not be overturned "unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id., citing Playboy Enters. v. Bacarat Clothing Co. 692 F.2d 1272, 1275 (9th Cir. 1982).

### A.  Discussion

Plaintiffs first assert that the evidence at the trial warrants a finding that the Defendants' conduct satisfied the above-stated legal standard, and particularly, that the Defendants' conduct was malicious, deliberate and willful.  Plaintiffs relied extensively on the Court's finding that Mr. Amar was not credible, as supporting their theory that Defendants were culpable.

Plaintiffs also support their argument for attorneys fees because of litigation misconduct, principally that Defendants had not produced all documents requested, and also had not produced their pink hang tag on a timely basis, and inferentially, delayed its production because it was so incriminating.  Neither hang tag was admitted into evidence at the preliminary injunction hearing, but the Court considered it a significant part of the evidence introduced at the merits trial, leading up to the August 24, 2007 Opinion.

At the conclusion of the October 28, 2007 hearing, the Court made some comments concerning the allegations of litigation misconduct.  As previously noted, the Court was of the view that Defendants, or some of them, had not been candid with their counsel about their sales activity regarding True People merchandise, specifically about merchandise with the hang tag shown in Exhibit 344.  See N.T. 73 of 10/18/07.  After considering all of the evidence and the arguments, the Court concluded that although there were some missteps in the discovery process, it did not rise to the level of litigation misconduct as found in those cases that used litigation misconduct as grounds for finding an exceptional case.  Therefore, the Court concluded that it would be improper to rely on litigation misconduct as a basis for finding that this case is an exceptional case.  See N.T. 76.  This finding was warranted in part by the witnesses produced by Defendants on October 9 and October 18, 2007, all of whom the Court found credible on this issue.

The Court has decided to deny the Plaintiffs' Motion for Attorneys Fees under the "exceptional case" doctrine for several reasons:

1.     As noted above, the evidence of litigation misconduct was insufficient to meet the requisite standard.

2.      Both the preliminary injunction and the permanent injunction did not agree with all of Plaintiffs' contentions or grant Plaintiffs all of the relief that they requested.

3.      Plaintiffs voluntarily gave up any claim for damages, which is a factor under the case law for denying a motion for attorneys fees.  Ferrero, 952 F.2d at 47.

4.      "Intent" is Lapp factor No. 5, and is also an important factor in exceptional case decisions.  The case law suggests that a higher degree of culpability must be found, over and above "intent" as a Lapp factor.

The findings and evidence in this exceptionally competitive and constantly changing business prove that Defendants wanted to move the "True People" brand up-market.  Although Defendants chose Plaintiffs' "Free People" brand for emulation, their conduct crossed the line into infringement.  After reviewing the relevant Third Circuit cases, the Court concludes that although none of these cases is a direct precedent for this case, the discussion in the cases requires something more than the intent described in Lapp factor 5.  As Judge Pollack stated in Jones Apparel Group, Inc., 466 F. Supp. at 560 (declining to award attorneys fees after another judge had found infringement, but on less incriminating facts), there must be "a finding of intentionality properly characterized as 'malicious,' 'fraudulent,' 'deliberate' or 'willful.'"  Indeed, Judge Jordan found that before a judge can award attorneys fees under the exceptional case doctrine, the court must apply the "clear and convincing test," see Calloway Gulf Co. v. Slazenger, 384 F. Supp. 2d 735 (D. Del. 2005), but the Third Circuit has not adopted this standard.  With the credible testimony of Mr. Choukroun establishing the innocent origin of the pink hang tag, and the other evidence of intent being largely inferential and/or circumstantial in nature, the Court concludes the record does not support finding the exceptional case doctrine in

-17-

favor of the Plaintiffs.[5]

## VI.    Rule 60(b) Issue

The last issue is Defendants' Motion for Relief under Rule 60(b) Fed. R. Civ. P. from the

August 24, 2007 Order, relying on the testimony and documents introduced at the hearing on

October 9, 2007, and requesting that the Court reopen the trial record to include the testimony

and documents received at the October 9, 2007 hearing.

### A.    Legal Standards As To Rule 60(b)

Rule 60(b) provides in applicable part:

> On motion and upon such terms as are just, the court may relieve a
> party or a party's legal representative from a final judgment, order,
> or proceeding for the following reasons. . . .
> (2) newly discovered evidence which by due diligence could not
> have been discovered in time to move for a new trial."
> (6) Any other reason justifying relief.

Newly discovered evidence refers to evidence of fact in existence at the time of the trial

of which the aggrieved party was excusably ignorant.  U.S. v. 27.93 Acres of Land, 924 F.2d

506, 516 (3d Cir. 1991).

A trial court's discretion in considering whether to grant a Rule 60(b) motion is broad and

is only reversible for clear abuse of discretion.  Virgin Islands National Bank v. Tyson, 506 F.2d

802 (1974).  However, a Rule 60(b) motion should only be granted where extraordinary

circumstances justify such relief.  See Plisco v. Union Railroad Company, 379 F.2d 15 (3d Cir.

1967) (regarding F. R. Civ. P. 60(b)(2)) and Sawka v. Healtheast, 989 F.2d 138, 140 (3d Cir.

1993) (regarding F. R. Civ. P. 60(b)(6)).

---

[5]The Court makes no ruling at this time on costs.  However, as prevailing party, Plaintiffs
should recover all items properly included in a bill of costs.

B.      <u>Rule 60(b)(2)</u>

The Third Circuit has stated that, under 60(b)(2) newly discovered evidence (1) must be material, not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence, and (3) would probably have changed the outcome of the trial. <u>Bohus v. Beoloff,</u> 950 F.2d 919, 930 (3d Cir. 1991).  Newly discovered evidence refers to evidence of fact in existence at the time of the trial of which the aggrieved party was excusably ignorant.  <u>U.S. v. 27.93 Acres of Land</u>, 924 F.2d 506, 516 (3d Cir. 1991).

Under Rule 60(b)(2), the testimony produced on October 9, 2007, particularly that of Mr. Choukroun, is material and not merely cumulative, for reasons stated elsewhere in this Memorandum.

However, the testimony of Mr. Choukroun does not meet the second prong of the test set out above – that the testimony must not have been discoverable before or during trial through the exercise of reasonable diligence.  <u>Bohus</u>, 950 F.2d at 930.  Defendants present no evidence that they attempted to depose or subpoena Mr. Choukroun before or during the trial despite the fact that Defendants' principals clearly knew of Mr. Choukroun's important personal knowledge of the origin of the pink hang tag.  Defendants contend they failed to request Mr. Choukroun to be a witness because his story was duplicative of testimony to be given by Mr. Amar.  Defendants claim that they were "dumbfounded" upon hearing that the Court did not believe Mr. Amar's testimony without corroboration from another witness.  (Def.'s Mot. at 20). However, as Plaintiffs point out, Defendants' inability to predict which of their witnesses the Court might find credible does not warrant reopening the record.  Even if Mr. Choukroun's presence at trial might have been difficult to secure, as noted below, Defendants could have at least deposed him prior

to trial, even if by telephone.  No party claims expense as a factor in not taking discovery.

Indeed, it appears both sides have unlimited budgets for this case.  Therefore, this lack of

initiative on Defendants' part weakens their position under 60(b)(2).

In their Motion for Relief, Defendants frequently cite Compass Technologies, Inc. v.

Tseng Laboratories, Inc., 71 F.3d 1125 (3d Cir. 1995), in which the Third Circuit overturned a

district court's decision not to reopen the record when, several days after a trial was completed, a

key witness was located.  The case involved a contract dispute; once located, the witness was

able to testify to key provisions in the contract between the parties and his testimony discredited

one of the main witnesses for the prevailing party.

Plaintiffs distinguish Compass Technologies by pointing out that in that case, both parties

searched for the critical witness before and during the trial but could not locate him, whereas in

the instant case, Defendants knew of the existence and location of Mr. Choukroun, and chose not

to try to depose him.

Plaintiffs point to Giordano v. McCartney, 385 F.2d 154 (3d Cir. 1967) where the district

court's decision to deny a Rule 60(b) Motion was upheld where the moving party could not

satisfactorily explain why it had made no attempt to locate and question a key witness prior to

trial.  See also Plisco v. Union Railroad Co., 379 F.2d 15 (3d Cir. 1967) (upholding district

court's denial of Rule 60(b) motion where newly discovered witness's testimony could have

changed the outcome of the case but where movant knew other witnesses worked at the scene of

the incident, but did not seek them out prior to the trial, movant's ignorance of the new witness

was inexcusable).[6]

_____

[6] Both Giordano and Plisco were jury trials.

Defendants' attempt to distinguish <u>Giordano</u> and <u>Plisco</u> by pointing out that Mr. Choukroun is a foreign national and therefore he is not under the jurisdiction of the Court and could not have been easily subpoenaed.  However, Mr. Choukroun's own testimony shows that he was in the United States at various times, before the record closed, although he testified that he was not told about his possible importance as a witness until he was about to leave the United States, <u>see</u> N.T. 90-93, 114-115, 139.  Defendants made no effort to advise Plaintiffs or the Court of his important, firsthand testimony until after the Court had entered the August 24, 2007 Permanent Injunction.  If requests had been previously made to keep the trial record open, the Court would probably have done so, as this was a non-jury case.  In addition, Mr. Azria accompanied Mr. Amar on the trip to Hong Kong and could have testified by deposition or at the trial, but never did so.

As to the third requisite under the case law for discussing Rule 60(b)(2), the Court must also find that the new evidence "would probably have changed the outcome of the trial."  The Court has considered this element carefully and concludes that Mr. Choukroun's testimony, even if admitted into the trial record, would not change the result.  It may be difficult to apply this test in a jury trial; however, this was a bench trial.  The Court has carefully reviewed the findings contained in the Memoranda of April 19 and August 24, 2007, and concludes that even if Mr. Choukroun's testimony was accepted for purposes of the merits, and therefore the Court concluded that the adoption of the pink hang tag by True People was innocent and not part of any infringement scheme, there would still be sufficient evidence in the record for the Court to find that Plaintiffs met their burden of proof of showing infringement.

Although the acceptance of Mr. Choukroun's testimony is an important factor in denying

-21-

the "exceptional case" doctrine, it negates only one aspect of Plaintiffs' infringement claim, that the pink hang tag on a number of True People garments was part of the infringement scheme. Eliminating this aspect of the case does not eliminate the other evidence of the infringement, such as the various marketing initiatives Defendants engaged in. The Court found these actions were sufficient to prove infringement, applying the <u>Lapp</u> factors test.

 **C.**  <u>**Rule 60(b)(6)**</u>

  Defendants acknowledge that Rule 60(b)(6), which allows the Court to reopen a case for "any other reason justifying relief," may be a more appropriate grounds for relief than Rule 60(b)(2). The Supreme Court has said that to accomplish justice, a court may vacate a judgment for any adequate reason. <u>Klapprott v. United States</u>, 335 U.S. 601, 615 (1949). However, relief under Rule 60(b)(6) is available to litigants only in cases evidencing "extraordinary circumstances." <u>Martinez-McBean v. Government of Virgin Islands</u>, 562 F.2d 908 (3d Cir. 1977) (overturning district court for concluding two and a half years after making a ruling that it had made an error of law and granting relief from previous order of dismissal under 60(b)(6)).

  Extraordinary circumstances, while largely undefined, only occur where, "without such relief, an extreme and unexpected hardship will occur." <u>Ibarra v. W.Q.S.U. Radio Broadcast Org</u>., 218 Fed.Appx. 169 (3d Cir. 2007) <u>citing Sawka v. Healtheast</u>, 989 F.2d 138, 140 (3d Cir. 1993). The Court explains that a "healthy respect for the finality of judgments demands no less." <u>Mayberry v. Marony</u> 558 F.2d 1157, 1163 (3d Cir. 1977). Several searches through relevant case law suggest that Rule 60(b)(6) Motions are rarely, if ever, granted.

  Under <u>Compass Technologies, Inc.</u>, 71 F.3d at 125, the Court has discretion to grant a Rule 60(b) motion to reopen the trial record where credible evidence indicates that a witness with

personal knowledge of a material fact, disputed at trial, has come forward.  However, the record should only be reopened to allow such testimony if the party asking for relief exercised reasonable diligence in seeking out this witness during discovery and a good reason exists as to why the witness was not brought forward earlier.

The Court has decided to deny Defendants' Motion to Reopen the Record under Rule 60(b)(6) because the evidence shows that the Defendants' principals, Mr. Azria and Mr. Amar, had met with Mr. Choukroun, knew of his involvement and should have at least brought these facts to the attention of their counsel and the Court prior to the close of the record.  In view of the importance which the Plaintiffs attached to Exhibit 344 at the merits trial, and the Court noting that it was interested in hearing testimony as to the origin of the pink hang tag, Defendants should have taken steps to produce Mr. Choukroun as a witness because he was in a position to give first-hand testimony corroborating Mr. Amar's testimony as to the origin of the pink hang tag.

Mr. Choukroun testified that if he had been asked to come to the United States, even for a special trip, he probably would have done so, as BCBG is one of his largest customers.  See N.T. 139.

The case law under 60(b) does not allow a party with such knowledge to sit back and hope for a favorable verdict, and then if the verdict is unfavorable, suddenly to cry out for relief. The Court concludes it would be an abuse of discretion to reopen the record under these circumstances, under 60(b)(2) or 60(b)(6).[7]

---

[7]The Court recognized some inconsistency in that Mr. Choukroun's facts have been applied to the attorney fee issue, but not to the merits, but this results from the applicable legal standards.

**VII.    <u>Conclusion</u>**

For the reasons stated in the foregoing Memorandum, the Court will enter an Order awarding the Plaintiffs $26,562.00 in attorneys fees and expenses in connection with their Motion for Emergency Relief.  The Court will deny the Plaintiffs' Motion for Attorneys Fees for the entire trial under the exceptional case doctrine and will deny the Defendants' Motion to Reopen the Record under Rule 60(b).

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

URBAN OUTFITTERS, INC., et al.          :          CIVIL ACTION

              v.          :

BCBG MAX AZRIA GROUP, INC., et al.   :          NO. 06-4003

## ORDER

    AND NOW, this   31st   day of January, 2008, based on the foregoing Memorandum, it is

hereby ORDERED as follows:

    1.      The Court awards to Plaintiffs attorneys fees and costs on their Emergency Relief

Motion (Doc. No. 156), in the amount of $26,562.00, and orders Defendants to pay this amount

to Plaintiffs within ten (10) days.

    2.      Plaintiffs' Motion for Attorneys Fees under the exception case doctrine (Doc. No.

214) is DENIED.

    3.      Plaintiffs' Motion under Rule 60(b) to reopen the record (Doc. No. 228) is

DENIED.

    4.      Any undecided motions are DENIED as moot.

    5.      The Clerk shall close this case.

                        BY THE COURT:

                        s/Michael M. Baylson

                        _____

                        Michael M. Baylson, U.S.D.J.

O:\CIVIL\06-4003 Urban Outfitters v. BCBG Max\Urban Outfitters - Memorandum P's Attorney Fees.wpd